**E-FILED**
Wednesday, 06 September, 2006  01:51:32 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Criminal No. 06-30012 |
| v. | ) | |
| | ) | |
| CECIL TURNER, et al., | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO AMEND THE INDICTMENT

The United States of America by its attorneys Rodger A. Heaton, United States Attorney

for the Central District of Illinois, and Gregory M. Gilmore and Patrick J. Chesley, Assistant

United States Attorneys, moves this Court to allow the government to file an Amended

Indictment that dismisses two counts and renumbers the remaining counts.  In support of this

motion the government states as follows:

1.  On February 3, 2006, the returned an eight count indictment against the defendant

Cecil Turner.  The first six counts charged Turner along with three co-defendants with wire fraud

in violation of 18 U.S.C. §§1343, 1346 and 2.  The seventh and eighth counts charged Turner

alone with making false statements to the Federal Bureau of Investigation in violation of 18

U.S.C. §1001.

2.  Since the return of that indictment, the government has determined that counts four

and five of that indictment should be dismissed.  The reason for such dismissal is that such

counts allege interstate wire transfers related to the direct-deposits of two salary payments of

- 1 -

Steven Boyce that occurred after he had begun cooperating with the government.  Such wire transfers were not in furtherance of the scheme since Boyce was acting as a government agent at the time and not a co-schemer.  Therefore, pursuant to Federal Rule of Criminal Procedure 48(a) the government moves to dismiss counts four and five of the original indictment.

3.  In order to avoid a gap in the indictment showing the absence of counts three and four the government asks leave of the Court to file the attached Amended Indictment that renumbers the original counts six, seven and eight to counts four, five and six in the Amended Indictment.

4.  The government believes that the Amended Indictment will avoid jury confusion and prevent the jurors from speculating as to what occurred with respect to counts four and five in the original indictment.  The defendant will not be prejudiced by the filing of and the trial on the Amended Indictment.

5.  The attorneys for defendant Turner have been provided copies of this motion and the Amended Indictment and have indicated that they have no objection to the Court granting this motion and proceeding to trial on the Amended Indictment.


Respectfully submitted,

s/ Gregory M. Gilmore
Gregory M. Gilmore   6217499
Assistant United States Attorney
United States Attorney's Office
318 South Sixth Street
Springfield, IL 62701
Telephone: (217) 492-4450
Fax: (217) 492-4044
E-mail: greg.gilmore@usdoj.gov

s/ Patrick J. Chesley
Patrick J. Chesley 0434841
Assistant United States Attorney
United States Attorney's Office
318 South Sixth Street
Springfield, IL 62701
Telephone: (217) 492-4450
Fax: (217) 492-4044
E-mail: pat.chesley@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael B. Metnick
Richard Kim
Attorneys at Law
Suite 200 Myers Building
P.O. Box 12140
Springfield, IL 62791


‾‾‾‾‾‾‾s/ Patrick J. Chesley

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Criminal No. 06-30012 |
| v. | ) | Violation: 18 U.S.C. §§ 2, 1343, 1346 & |
| | ) | 1001 |
| | ) | |
| DANA DINORA, | ) | |
| DAVID MEDVESEK, | ) | |
| STEVEN BOYCE, and | ) | |
| CECIL TURNER, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED INDICTMENT

THE GRAND JURY CHARGES:

## COUNTS ONE THROUGH FOUR
### Wire Fraud
### 18 U.S.C. §§ 1343, 1346 and 2

**A.** **Introductory Allegations**

*Overview*

1.     The defendants Dana Dinora, David Medvesek, Steven Boyce and

Cecil Turner fraudulently deprived the State of Illinois of its right to their honest

services and defrauded it of more than $150,000, in that Dinora, Medvesek and

Boyce falsely caused their employer to believe they were at work for thousands

of hours when in fact they were not at work and Turner protected them from being caught or disciplined for their unauthorized absences.

### The Defendants

2.    Dana Dinora, David Medvesek and Steven Boyce were employed full time as night janitors for the Division of Physical Services of the Illinois Secretary of State's Office.

3.    Cecil Turner was the Director of the Division of Physical Services for the Illinois Secretary of State.

4.    Until March 31, 2004, Dinora also was employed full time as a supervisor for the City of Springfield Public Works Department. In that position Dinora could properly direct Public Works employees to perform various tasks including collection of trash and other items that blocked a through-way or otherwise created a public hazard in the City of Springfield. After Dinora left employment with the city he was still able to influence Public Works employees to use city equipment on city time to collect trash and perform other tasks. At no time was it proper for Dinora to direct city employees using city equipment on city time to perform personal favors, including trash collection, merely for the convenience or benefit of individuals. The proper way for individual homeowners and others to dispose of their trash was to hire and pay a private

2

entity to pick up and dispose of the trash.

5.      Frequently during the period of the scheme, Turner contacted Dinora and asked him to direct City of Springfield Public Works Department employees to perform special favors for him in the form of work that the city employees were equipped to perform but were not supposed to perform solely for the benefit of individuals. The work that Turner requested and that city employees performed using city equipment on city time included, among other things: the expedited removal of leaves, tree limbs and other yard waste at or near Turner's and others' property; the removal and disposal of trash, including an old dog house, a broken water heater, a broken refrigerator, bags of trash following campaign events and other trash from Turner's property; and, following a political campaign, the removal and disposal of numerous campaign signs for a candidate Turner supported, including a large number of such signs that had been collected and returned to Turner's property by others.

**The Defendant's Responsibilities**

6.      As the Director of Physical Services for the Illinois Secretary of State, Cecil Turner was responsible for, among other duties, the maintenance of certain State owned or occupied buildings, including the Herndon Building and the Court of Claims building in Springfield, Illinois.  Such responsibility included

ensuring that the supervisors of his co-defendants properly supervised them by making sure that they were at work during their official duty hours, performed their job responsibilities while at work and properly used leave when they were not at work.

7.    At least two levels of supervision existed between Turner's position and that of his co-defendants, the janitors.

8.    Dana Dinora, David Medvesek and Steven Boyce were responsible each work day for providing janitorial services at state office buildings in Springfield, including the Herndon Building and the Court of Claims building.

9.    Turner was not authorized to cause or allow the State of Illinois to pay any of its employees for duty hours they were not at work unless the employees were on approved leave.

10.    Shortly after Cecil Turner became the Director of Physical Services for the Illinois Secretary of State, Turner promoted Dinora to the lead janitor position over the night janitorial crew at the buildings in which Dinora worked. As the lead janitor, Dinora assigned the janitors in his crew to the buildings where they would work and determined what tasks they would perform there.

### Official Duty Hours

11.    Dinora's, Medvesek's and Boyce's official duty hours were from 3:00

4

p.m. until 11:00 p.m. on Monday through Friday.  For any period of time they were not at work during those official duty hours (other than for state holidays and allowed breaks, including a dinner break), they were required to  submit and have approved leave requests.

12.    According to rules of the Illinois Secretary of State, Dinora, Medvesek and Boyce were not entitled to receive pay from the State of Illinois for duty hours they were not at work unless they were on leave.

B.    **The Scheme**

13.    Beginning in or about April 1999 and continuing until in or about the end of August 2005, at Springfield and elsewhere in the Central District of Illinois, the defendants

**DANA DINORA,**
**DAVID MEDVESEK,**
**STEVEN BOYCE and**
**CECIL TURNER**

knowingly and with the intent to defraud, devised, executed, and aided and abetted the execution of a scheme and artifice to deprive the State of Illinois of its intangible right to their honest services and to defraud and obtain money from the State of Illinois by means of false and fraudulent pretenses, promises and representations, which scheme and artifice is described below.

*The Manner and Means of the Scheme*

14.     As part of the scheme, defendants Dana Dinora, David Medvesek and Steven Boyce devised a system that enabled them to receive their full salaries despite working only a fraction of their official duty hours.  As the scheme progressed, the amount of hours for which they were paid without working increased.

15.     Beginning in approximately January 2004 and continuing until the end of the scheme, defendant Dana Dinora (a) rarely arrived at work at or near 3:00 p.m. as he was required to do, (b) normally did not arrive at work until after 10:00 p.m., (c) typically spent less than 30 minutes at work each day, and (d) virtually never worked his entire shift.

16.     Beginning in approximately January 2004 and continuing until the end of the scheme, defendants David Medvesek and Steven Boyce, with the knowledge and approval of Dana Dinora, adopted a system that enabled them each to work minimal hours on alternating days and to leave early every day without taking leave. Under the system, one of them left work usually before 5:00 p.m., and the other left usually before 10:00 p.m. They arranged in advance who worked the longer period and who worked the shorter period and, in general, alternated the long and short days between them.

17.    As a part of the scheme, defendants Dinora, Medvesek and Boyce developed the following ways to conceal their unauthorized absences from work without taking leave:

a.    When a janitor who was at work was asked by someone where another member of the janitorial crew could be located, the janitor who was at work would say that the other janitor was working at another building. The janitor who was at work would then telephone the absent janitor so that he could come into work or call the person who had inquired about him.

b.    When Medvesek or Boyce (whichever one stayed at work later) left work for the night, he would put a note in the janitors' area at the Herndon Building.  The note falsely said that Dinora had gone to the Court of Claims building.  When defendant Dinora arrived at work after 10:00 p.m. to close the Herndon Building, he would remove the note.

c.    Beginning in the Spring of 2005 and continuing until August, 2005, Medvesek and Boyce, with the knowledge and approval of Dinora,  created two sets of Daily Attendance sheets concerning their work status.  One Daily Attendance sheet reported that each janitor had worked all the hours of his shift. The other Daily Attendance sheet reported that the janitor had used leave for the unauthorized time that he was absent during his work shift.  If no one in a

7

position of authority noticed or questioned a janitor's absence from work, that janitor submitted the Daily Attendance sheet that  falsely reported that he had worked all of his official duty hours. If someone in a position of authority noticed or questioned a janitor's absence from work when he was supposed to be working, the janitor would submit the Daily Attendance sheet showing that he had taken leave.

        d.     When Dinora's immediate supervisors questioned the amount of time that Dinora, Medvesek or Boyce were working, Dinora notified Cecil Turner so that Turner was aware and could prevent any potential disciplinary actions from being taken against the janitors.

18.    Beginning in April of 1999 and continuing until the end of August 2005, Dinora, Medvesek and Boyce submitted paperwork reflecting the hours they falsely claimed to have worked, knowing that the false paperwork was used by the Office of the Illinois Secretary of State to determine the amount of their wages.  They also caused the State of Illinois to provide salary payments to them by means of wire transfers of funds to be direct-deposited into their bank accounts.  The wire transfer of funds for Dinora and Boyce traveled interstate.

*Turner's Aiding and Abetting the Execution of the Scheme*

19.    Knowing that Dana Dinora and the other janitors on his crew were

8

not working all the hours for which they were being paid, Cecil Turner aided and abetted his co-defendants' scheme by taking actions that hindered, impeded and prevented the supervisors of Dinora, Medvesek and Boyce from investigating the amount of time they actually were at work and from taking disciplinary action against one or more of them for failing to work their entire shifts.

*Acts in Furtherance of Aiding and Abetting the Scheme*

20.     Turner discouraged, hindered, impeded and prevented  the supervisors of Dinora, Medvesek and Boyce from checking to see whether they were at work when they were supposed to be there and from complaining of their unauthorized absences, as follows:

a.     In approximately April 1999, after a supervisor reported that Dinora and his crew were not working as they should have been, Turner caused that supervisor to be relieved of his duties.

b.     In 2001, a second supervisor of Dinora became aware that Dinora and his crew were not working as they should have been, and the supervisor instructed Dinora that Dinora and his crew had to report to work and fulfill their job responsibilities. The next day Turner told the second supervisor to leave Dinora and his crew alone.  In the summer of 2002, the second supervisor parked across the street from the Herndon Building and observed Dinora leave

the building as if he were finished working between 6:30 p.m. and 7:00 p.m.

Dinora saw the supervisor watching him. The next day, Turner called the second

supervisor into his office and told the second supervisor not to check up on Dana

Dinora again.

   c. During January 2003, Cecil Turner called a third supervisor

into his office and reprimanded the third supervisor for having reported that

Dinora and his crew were not working as they should have been.

   d. In January 2004, a fourth supervisor made a written report to

Turner that documented the fourth supervisor's findings that the three janitors

were not cleaning the buildings properly and were not at work at required times.

Shortly after the report was submitted, Turner screamed at the fourth supervisor

for making a written report and said that the action of the fourth supervisor had

stabbed him in the back.

   e. On August 9, 2005, the fourth supervisor tried to visit Dinora

at the Herndon Building during Dinora's work hours but was unable to locate

Dinora. After paging Dinora, he reported to the Herndon Building where he met

the fourth supervisor, who relayed to Dinora complaints regarding the lack of

cleanliness of the Building. Dinora telephoned Turner and told him that Dinora

thought the supervisor was trying to catch him not working. During the

conversation the following statements were made:

Dinora:        . . . It's like she wanted to come over here and try to catch me I think.

Turner:        Nah, nah . . . it ain't about that. She ain't looking to catch you doing [expletive removed].  She knows better than that.

Dinora:        Okay.  Well . . . .

Turner:        She already [expletive removed] knows better than that.
               . . .
               Dana.  She has to do what the [expletive removed] I tell her to do.  She reports. . . .
               . . .
               Okay?  The building managers come to me . . . .
               . . .
               They all [expletive removed] report to me.  So, you ain't got [expletive removed] to worry about.
               . . .
               Hey man.  Don't, don't let that [expletive removed] scare you, Dana.  I done told you I got your back, man.

       f.      In the summer of 2005 Turner learned that the Illinois Secretary of State's Inspector General would be conducting an audit of all departments, including the Physical Services Department.  After Turner learned this, he cautioned Dinora that Dinora and his crew should put in leave slips while the possibility of an Inspector General investigation existed.

       g.      On August 17, 2005, the fourth supervisor again told Turner that Dinora, Medvesek and Boyce were not at work when they were supposed to be working.  Turner told the fourth supervisor to tell the janitors that they needed

to be at work and if they were not there they should put in a leave slip. Turner also discouraged the fourth supervisor from checking-up on the janitors by saying that the fourth supervisor should not "baby sit" the janitors.

       h.    Shortly after Turner's meeting with the fourth supervisor, on August 17, 2005 Turner caused another individual to warn Dinora that he and his crew needed to be at work because Secretary of State personnel could be checking up on them. During that conversation the following statements were made:

| | |
|---|---|
| Individual: | Cecil told, Cecil's at work, and he didn't want to talk to you at work. But, he wanted me to call you and tell you that [your supervisor] . . . said something to him about she knew that you guys were signing in and leaving . . . . . . . |
| Dinora: | Okay. You want me, you think I should call him at work, or . . . |
| Individual: | No. No. No, I mean . . .no. Don't call him at work. . . . 'Cause he don't wanna talk about it, you know, on the work phone. |
| Dinora: | Okay. I'll pass it on to the boys. |
| Individual: | Okay. Don't say I said . . . . . . Okay. But just, yeah, but just . . . just don't say I said it, okay? |
| Dinora: | Hey, uh, you want me to just say uh . . . just tell 'em to be careful? |
| Individual: | Yeah. Just tell 'em to be careful with it. |

       21.    In January 2005 when Dinora's supervisor saw him at a high school

basketball game during his normal work hours, the supervisor contacted Turner. Turner falsely claimed that he had spoken to Dinora before the game and had approved Dinora's leave to attend the game.

22.    In August 2005, the investigators from the Inspector General's Office for the Illinois Secretary of State met with Turner and informed him that Dinora, Medvesek and Boyce were being investigated for not being at work during their official duty hours. The Inspector General agents asked Turner not to tell the janitors of such investigation. Later, on September 9, 2005, Turner personally warned Dinora the Inspector General was investigating the janitors and that Dinora needed to make sure that he submitted leave slips if he was not at work. On that date the following statements were made:

Turner:        . . . You just take it easy and just fill your slips out. Okay?

Dinora:        Okay.

Turner:        'Cause that, that [expletive removed] [your supervisor] . . . and you don't say a [expletive removed] word about this. That [expletive removed] [your supervisor] called the IG on you guys.

Dinora:        Oh really?

Turner:        Yep, so they're watchin' your moves. Just wanted you to know it. But you didn't hear it from me.

### Duty to Provide Honest Services

23.    As state employees, Turner, Dinora, Medvesek and Boyce each owed

the Secretary of State and the State of Illinois a duty to provide honest, loyal and

faithful services free from deception, promotion of self interests, self dealing and

fraud.

### *Failure of Janitors to Provide Honest Services*

24.     During the course of the scheme, the defendants Dana Dinora, David

Medvesek, Steven Boyce and Cecil Turner deprived the State of Illinois of its

intangible right to their honest services as follows:

a.     The three janitors, Dinora, Medvesk and Boyce, failed to be at

work for all of their official duty hours as required;

b.     They assisted each other's unauthorized absences from work;

c.     They developed and implemented methods to cover-up their

unauthorized absences from work;

d.     They failed to inform their employer of their own

unauthorized absences and that of the other janitors;

e.     Defendant Turner hindered, impeded and prevented the

supervisors of Dinora, Medvesek and Boyce from doing their jobs to properly

supervise and discipline his co-defendants;

f.     Turner failed to take action to ensure that Dinora, Medvesek

and Boyce were providing honest services to the Illinois Secretary of State and

14

the State of Illinois when put on notice that they were not;

        g.     Turner took affirmative action to cover-up the unauthorized absence of Dinora from his work as a janitor;

        h.     Turner allowed the moneys of the Illinois Secretary of State and the State of Illinois to be paid to his co-defendants for work they did not perform and for which the Illinois Secretary of State and the State of Illinois received no benefit; and

        i.     Each of the defendants received a substantial amount of money for wages to which he was not entitled, as they were not providing honest services.

**C.**    **Execution of the Scheme**

    25.    On or about the dates listed below for each count for the purposes of executing and attempting to execute the aforesaid scheme the defendants

**DANA DINORA,**
**DAVID MEDVESEK, and**
**STEVEN BOYCE**

knowingly caused the interstate wire transfer of funds identified in each count to be made, and the defendant

**CECIL TURNER**

knowingly aided and abetted the execution of his co-defendant's scheme and

15

knowingly executed the scheme to defraud his employer of his honest services:

| COUNT | DATE | PAYEE | AMOUNT | BANK |
|-------|------|-------|--------|------|
| 1. | 10/26/2004 | Dinora | $1,143.40 | Bank One |
| 2. | 11/10/2004 | Dinora | $1,153.40 | Bank One |
| 3. | 12/23/2004 | Dinora | $1,153.40 | Bank One |
| 4. | 11/10/2004 | Boyce | $1,026.31 | Nat'l City |

All in violation of Title 18 U.S.C. §§ 1343, 1346 & 2.

## COUNT FIVE

### MAKING FALSE STATEMENTS
### 18 U.S.C. § 1OO1

On or about October 13, 2005 at Springfield, Illinois, in the Central

District of Illinois, the defendant

### CECIL TURNER

knowingly and willfully made to agents of the Federal Bureau of Investigation

the following materially false and fictitious statements and representations, with

respect to a matter within the jurisdiction of the Federal Bureau of Investigation,

namely an investigation related to whether night janitors employed by the

Illinois Secretary of State's Office defrauded the State of Illinois by being paid, by

means of interstate wire transfers, for hours they did not work:

a.    Turner told the agents that the first time he learned there was a

problem with the janitors at the Herndon Building was approximately one and

one half months prior to October 13, 2005, when in fact supervisors had put him

on notice about the janitors on a number of occasions prior to that date;

b.    Turner told the agents that he had never reprimanded any

supervisor for checking on the janitors at the Herndon Building, when in fact he

had done so on at least one occasion; and

c.    Tuner told the agents that he had complied with the request of the

17

Inspector General investigators not to tell anyone of their investigation of the

janitors at the Herndon Building, when in fact he personally had warned Dinora

of the investigation by stating to Dinora on September 9, 2005, "[Your supervisor]

called to IG guys on you guys.... Yep, so they're watching your moves. ... But you

didn't hear it from me."

All in violation of Title 18 U.S.C. § 1001.

## COUNT SIX

## MAKING FALSE STATEMENTS
### 18 U.S.C. § 1OO1

On or about November 17, 2005 at Springfield, Illinois, in the Central

District of Illinois, the defendant

### CECIL TURNER

knowingly and willfully made to agents of the Federal Bureau of Investigation

the following materially false and fictitious statements and representations, with

respect to a matter within the jurisdiction of the Federal Bureau of Investigation,

namely an investigation related to whether night janitors employed by the

Illinois Secretary of State's Office defrauded the State of Illinois by being paid, by

means of interstate wire transfers, for hours they did not work:

a.      Turner told the agents that he was not aware of Dinora or any other

janitors' not being at work when they were supposed to be, when in fact he knew

that Dinora and his crew were not always at work at such times; and

b.      Turner told the agents that he had never told Dinora that he would

watch Dinora's back and cover for Dinora, when in fact Turner had made such

statements to Dinora on at least one occasion, including telling Dinora on August

9, 2005, "I got your back."  Additionally on September 22, 2005, when the

following statements were made:

Dinora:        You know I haven't been at work all the time, in the past.

Turner:        Yeah.  But they don't know that.  They don't know that, but you at work now.
               . . .
               That's all, hey.  That's all the [expletive removed] you gotta worry about.

Dinora:        But, you always covered my back.  I mean, I . . . .

Turner:        Yeah.  Ain't nobody asked me nothing about that.  Ain't nobody asked me nothing about that.
               . . .
               That ain't, that hasn't even come up.  What they're doing is their investigation, now . . . which ain't [expletive removed].
               . . .
               All you gotta do, when you leave there, you put in a slip.  Like I told you.

Dinora:        Well, that's another problem.  I'm gettin' a little low on time.  Are we, you think we're ever gonna go back to the old days or . . . .

Turner:        {Expletive removed].  Well, I don't know . . . 'til they get done with their investigation . . .[laughs] yeah.

               You ain't gonna get fired. [Laughs].  Then what the Inspector General would do is they would go and do the investigation, and once they complete the investigation, they send it to the director for his decision as to what happens.  They don't make no recommendations.  All they can do is complete their investigation.
               . . .

Dinora:        I mean, you've always, you've always covered my back.

Turner:        Hey, hey, I know that.  And I'm bein' straight with ya . . . . don't you [expletive removed] tell nobody that you and I talked about that [expletive removed]. . . 'cause that'll get my [expletive removed] in a sling.

. . .

I told you I'd cover your [expletive removed], but now, it's like you gotta cover your [expletive removed].

. . .

Okay?  And if [expletive removed] gets back to normal, then, I'll let you know then.


All in violation of Title 18 U.S.C. § 1001.

A TRUE BILL,


s/ Foreperson
FOREPERSON


s/ Rodger A. Heaton
RODGER A. HEATON
UNITED STATES ATTORNEY

PJC/GMG

21